UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Iron Workers Local 25 Pension Fund, et al.

                Plaintiffs,          Case No. 19-cv-11145

v.

                                 Paul D. Borman

Schaval Erectors, LLC, Jerome Schaar, and    United States District Judge
KB Erectors, LLC

                                 Elizabeth A. Stafford

                Defendants.      United States Magistrate Judge

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 31) and DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 33)

### I.    Background

Plaintiffs are Trustees of Funds established and administered pursuant to

Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186 and The

Employees Retirement Income Security Act of 1974 ("ERISA") 19 USC § 1001, et

seq. The Plaintiffs are authorized to collect delinquent fringe benefit contributions

pursuant to 29 USC §1132(g) and 29 USC §1145.

Defendant Jerome "Jeremy" Schaar was the owner and operator of Schaval

Erectors, LLC ("Schaval") a steel erection company. Schaval was signatory to a

collective bargaining agreement with Iron Worker's Local 25 Union. (CBA, ECF

1

No. 31-2, CBA Signature Page, ECF No. 31-3.) Under that CBA, Schaval was required to pay certain fringe benefits on behalf of each of its employees performing work covered by the CBA. Defendant KB Erectors, LLC ("KB") is not a signatory to the underlying collective bargaining agreement. However, Plaintiffs have brought this action to hold KB liable for unpaid benefit contributions on the theory that KB is the "alter-ego" of Schaval, and Schaar personally liable on the theory that he is a fiduciary with respect to Plan assets at KB.[1]

On May 10, 2018 Defendant KB Erectors was incorporated by Renee Lowe, a longtime close friend of Schaar. (KB Erectors Corporate Documents, ECF No. 31-8.) KB began operations in approximately Mid-June 2018, one month after Schaval Erectors ceased operation. (Defendants' Response to RTAs ECF No. 33-8 ¶ 5.) At this time, Lowe was on leave from her job as a Delta Airlines gate attendant, and testified that she became interested in starting her own business. (Deposition of Renee Lowe ("Lowe Dep.") 6:2-7:22, ECF No. 31-10.) Lowe testified that she came up with the idea to start KB and approached Schaar for assistance and guidance. (Lowe Dep. 30:1-25, ECF No. 31-10; Deposition of Jerome Schaar ("Schaar Dep.")

---

[1] In a prior action, U.S. District Judge Marianne O. Battani entered default judgment on May 7, 2018 against Schaval and Schaar in the amount of $39,265.03 consisting of unpaid employee benefit contributions, late payment liquidated damages, and the mandates of 29 U.S.C. § 1132 (g)(2). (Case No. 18-cv-10461.) The judgment has been satisfied in full. However, an updated audit has indicated small additional amounts due from Schaval Erectors and Schaar. (Affidavit of Auditor, ECF No.31-7 ¶ 7) Plaintiffs claim there remains a $2,623.90 balance due, consisting of late payment liquidated damages in the amount of $1,866.26 and audit liquidated damages in the amount of $757.64.

10:11-11:22, ECF No. 31-4.) When asked about problems faced by Schaval Erectors, Lowe testified that she and Schaar did not discuss the problems in depth, and that "[h]e just said he was with the union." (Lowe Dep. 26:20-22, ECF No. 31-10.). "He told me the union had pulled all his workers and pretty much was putting him out of business. That's all I knew." (*Id* at 27:7-9.)

Prior to forming KB, Lowe had no experience in the steel erection trade or any similar industry, and no experience in bidding for jobs. (Lowe Dep. 7:3-22, ECF No. 31-10; Schaar Dep. 11:20-12:1, ECF No. 31-4.) Lowe testified that she would not have started KB, and would have been unable to operate KB, without Schaar's assistance.

> Q. … if Jeremy left the company, you'd have to find
> another Jeremy?
> A. Correct
(Lowe Dep. 19:5-7, ECF No. 31-10)
> ***
> Q. … if it wasn't for Jeremy, you wouldn't have done
> this?
> A. No
(*Id*. at 29:17-19.)

KB performs the same type of iron/steel erection work as Schaval. Both Schaval and KB worked primarily with Rohmann Iron fabrication shop. (Schaar Dep. 33:12-16, ECF No. 31-4.) Schaar introduced Lowe to Rohmann.

Schaar began working for KB when it commenced operation in approximately mid-June 2018. Schaar testified that before his departure from Schaval, Schaval had

limited employees, given that the Union pulled their workers from Schaval, and he had to hire workers "off the street" to finish his projects. (*Id*. at 9:14-17) Three other Schaval Erectors employees also came to work for KB at its startup. (Schaar Dep. 13:13-17; Lowe Dep. 14:8-19.)

When KB was formed, Schaar sold what appears to be all of his equipment to Lowe and KB. Defendants characterize this equipment as "a small drop" of the expenses Lowe and KB incurred to start and operate KB, and points this court to an "Expense Report" which lists expenses by vendor from July 3, 2018 through September 21, 2019. (ECF No. 33-11.) The payments to Schaval Erectors ($25,530.25) and to Jerome Schaar ($16,000) are the second and fourth largest expenses listed, out of a total of $244,913,54 in expenses. (*Id*.) Defendants characterize the purchases of equipment from Schaval/Schaar as "arm's length" transactions.

When questioned about the equipment, Lowe stated:

> Q. As far as equipment goes, how did you purchase your equipment?
> A. Jeremy pretty much had everything.
> Q. Stop there. When you say "everything," can you give me examples?
> A. The trucks, the welders, the welding leads, the knowledge.
> …
> Q. So you relied upon Jeremy for all the equipment to run KB erectors?
> A. Yes. I bought it from him.

(Lowe Dep. 8:11-23, ECF No. 31-10.) When asked about the payments, Schaar testified that he did not know why Lowe issued payments to both Schaar and Schaval Erectors. (Schaar Dep. 33:22-34:14.)

At KB, Defendant Schaar totally supervises the fieldwork, and the bids on jobs. Schaar testified that he must clear with Lowe before hiring or firing any workers. (Schaar Dep. 14:8-14.) Lowe testified that Schaar is "always in contact with me … asking me can we do this, can we do that… ." (Lowe dep. 15:1-4.) According to Schaar, Lowe performs all of the bookkeeping, and handles taxes and other similar tasks. (Schaar Dep. 22:7-9). At the time of her deposition, March 12, 2020, Lowe was not taking a salary from KB. (Lowe Dep. 17:25-18:5.) There is no testimony that Lowe has ever taken a salary from KB erectors, and at oral argument on June 9, 2021, counsel for defendants did not contend that she has ever received any money from KB.

Both companies, Schaval Erectors and KB Erectors used the same attorney, Thomas P. McKenney, to file incorporation documents. (KB Erectors Corporate Filing, ECF No. 31-8, Schaval Erectors Corporate Filing, ECF No. 31-9.) Both KB and Schaval use the same, widely available payroll system – Quickbooks. (Aff. of Plaintiff's Auditor, ECF No. 31-7, ¶ 10.)

An employee of Schaar at Schaval, who Schaar brought to KB, Myles Drake, testified:

A. When [Schaar] hired me, he said he was in the process of becoming de-unionized, and he was trying to change his company, how things work so he could have it the way he wanted it and stuff like that."

Q. Right

A. So it wasn't official at the time when I first started working, which is why when I was working for him it was Schaval, but he was in the process, and I think like my third paycheck or something was actually KB erectors instead of Schaval

(Deposition of Myles Drake ("Drake Dep.") 6:7-16, ECF No. 31-11)

Q. So at KB Erectors, did you do the same jobs?

A. Yeah. Like to me nothing changed, so it was basically the same thing

(*Id*. at 7:6-9.)

Schaar testified that he disagreed with Drake's testimony regarding what Schaar allegedly said to Drake. (Schaar Dep. 31:9-32:6.) Drake only worked for Schaval Erectors and/or KB Erectors during Summer, 2017. (Drake Dep. 7:1-5, ECF No. 31-11.)

An audit covering July 2018 through May 2019 was performed by Plaintiffs on Defendant KB Erectors based on documents obtained during the course of this litigation, established a balance of unpaid employee benefit contributions of $282,559.79. (Aff. of Auditor, ECF No. 31-7, ¶ 13.)

Plaintiffs filed the instant lawsuit on April 19, 2019. The Complaint contains three Counts:

**Count I:** Breach of Collective Bargaining Agreement and 29 U.S.C. § 1145 against Schaval Erectors

**Count II**: Breach of Fiduciary Duty against Jerome Schaar

**Count III**: Alter Ego/Successor/Single Employer Liability against KB Erectors

## II.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Where the moving party bears the ultimate burden of persuasion at trial, "the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Cockrell v. Shelby County School Dist.*, 270 F.3d 1036, 1056

(6th Cir. 2001) (quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of the nonmovant's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## III.    Analysis

### a.  Liability of Schaval Erectors and Jerome Schaar for Outstanding Balance

Plaintiffs ask that this Court enter judgment against Schaval Erectors and Jerome Schaar in the amount of $2,623.90 for additional unpaid benefit contributions. (*See* footnote 1, *supra.*) Defendants do not contest this claim.

Accordingly, the Court will enter judgment in favor of Plaintiffs and against Schaval Erectors and Jerome Schaar in the amount of $2.623.90 on Count I.

### b.  Proper Alter Ego Standard

"The alter ego doctrine was developed to prevent employers from evading obligations under the Act merely by changing or altering their corporate form. The doctrine 'will be applied, when appropriate, to treat two nominally separate business entities as if they were a single continuous employer.' " *N.L.R.B. v. Allcoast Transfer, Inc.,* 780 F.2d 576, 579 (6th Cir.1986) (*quoting Alkire v. NLRB.,* 716 F.2d 1014, 1018 (4th Cir.1983)). The doctrine "is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is 'merely a disguised continuance of the old employer.' " *N.L.R.B. v. Fullerton Transfer & Storage Limited, Inc.,* 910 F.2d 331,

336 (6th Cir. 1990) (*quoting Southport Petroleum, Co. v. N.L.R.B.,* 315 U.S. 100, 106, 62 S.Ct. 452 (1942)).

In the labor law context, courts have employed the NLRA standard, the so-called "relaxed" version of the alter ego test, which requires a showing that "the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership," *Nelson Elec. v. NLRB,* 638 F.2d 965, 968 (6th Cir.1981), and which is applied in "a more relaxed, less exacting fashion than would be required under federal common law principles." *Fullerton,* 910 F.2d at 336. Under the NLRA standard, the plaintiff is relieved of the obligation to show intent to avoid labor obligations. *See Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 587–88 (6th Cir. 2006).

Plaintiffs argue that the more relaxed NLRA standard should apply. Defendants argue that this Court should apply the common law "corporate" standard and directs this Court to *Trustees of Operating Engineers Local 324 Pension Fund v. Bourdow Contracting, Inc.,* 919 F.3d 368, 375-76 (6th Cir. 2019). However, in *Bourdow*, "Defendant did not challenge the applicability of the alter-ego test of the NLRA before the district court." *Id* at 375. Thus, this issue was not decided by the Sixth Circuit in *Bourdow*.

The NLRA relaxed version of the alter ego test has been applied in the Sixth Circuit in the labor law context:

> The alter ego doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is "merely a disguised continuance of the old employer." *Southport Petroleum, Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942); *see also Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel and Restaurant Employees, and Bartenders Int'l Union,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

*Fullerton,* 910 F.2d at 336 (footnote omitted).

Further, District Courts in the Sixth Circuit, including this Court, have used the NLRA standard to determine alter-ego liability in ERISA unpaid fringe benefit cases. *See e.g. Michigan BAC Health Care Fund, Trustees of v. Hartley Masonry Servs., Inc.,* No. 17-12260, 2018 WL 6527497 (E.D. Mich. 2018) (applying NLRA standard to determine alter-ego liability in an ERSIA unpaid fringe benefits case based on disguised continuance); *Trustees of the Detroit Carpenters Fringe Benefit Funds v. Andrus Acoustical, Inc.,* No. 11-CV-14656, 2014 WL 1746399, at *10 (E.D. Mich. 2014) (Borman, J.) (applying the NLRA standard in an ERISA unpaid fringe benefits action, where the basis for the alter ego liability was that the two companies in question engaged in a "double-breasted" operation); *Michigan Glass & Glazing Indus. Defined Contribution Pension Plan v. CAM Glass, Inc.,* No. 06-12917, 2008 WL 506350, at *1 (E.D. Mich. Feb. 22, 2008) (applying NLRA standard in an ERSIA unpaid fringe benefits case).

This Court will apply more relaxed NLRA standard in this case, where the alter ego liability is premised on a "disguised continuance" theory. *See, e.g.*, *Yolton,* 435 F.3d at 587–88; *Fullerton,* 910 F.2d at 336. KB Erectors, the company sought to be held liable is engaged in the same line of business as Schaval Erectors, the company originally liable under the CBA. *See Fullerton,* 910 F.2d at 337 & 336 n. 7. In this case, the two Defendant employers, Schaval Erectors and KB Erectors, and Jerome Schaar, have acted to avoid obligations by merely changing its corporate form on paper.

The Defendants' Motion for Summary Judgment on the question of alter-ego liability relies entirely on an application of the common law standard. (ECF No. 33 PageID.485-493.) Accordingly, because the Court has decided to not apply the common law standard, Defendants' Motion for Summary Judgment on the alter-ego liability claim is DENIED.

### c.  Application of the NLRA Alter Ego Standard

In a disguised-continuance case, courts ask "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership" in deciding whether one is the alter ego of the other. *Fullerton,* 910 F.2d at 336 (quoting *Nelson Elec. v. NLRB,* 638 F.2d 965, 968 (6th Cir.1981)). Evidence, or lack thereof, of an employer's intent to evade the

obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status. *Id.* at 337. This has been described as a "more relaxed, less exacting" application of the alter-ego doctrine applied "[i]n order to effectuate federal labor policies." *Id.* The analysis is flexible and "no one element should become a prerequisite to imposition of alter-ego status; rather, all the relevant factors must be considered together." *Allcoast Transfer,* 780 F.2d at 582. Each factor will now be addressed.

### i. Management

This factor looks to "the nature of the management structure in the two companies," including overlap in those who "played a managerial role." *Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.,* 669 F.3d 790, 795 (6th Cir. 2012) ["*Dorn Sprinkler*"]; *Bourdow,* 919 F.3d at 376.

Defendants argue that compared to Schaval, where Schaar "was the owner and sole operator … with complete discretion to manage and operate his business without oversight," at KB, "Schaar was an employee … and did not have control of the operations of the business." (ECF No. 36 PageID.1031.)

Although Schaar allegedly no longer operates KB Erectors without some Lowe oversight on a few matters, it is uncontroverted that he effectively manages every aspect of the day-to-day job operations of KB. Defendants admit that Schaar's

responsibilities at KB are "managerial in nature." (*Id*.) Although Lowe testified that she makes "final decisions on a lot of the jobs," she concedes she has no experience in the business, does not provide any of the job estimates, does not allege she goes to job sites, and does not deny that Schaar makes all operational decisions. (Lowe Dep. 22:11-23:11.) Thus, Schaar's responsibilities at KB do not include check signing or filing corporate documents; there is no material dispute that Schaar occupies the managerial/operational role at KB. This factor, his bringing over all of Schaval's equipment and his Schaval employees, weighs in favor of the Plaintiffs and a finding of alter-ego liability.

### ii.  Business Purpose

It is undisputed that KB Erectors and Schaval Erectors perform the same type of specialized steel erection work, and both work primarily with Rohmann Iron. (ECF No. 36 PageID.1032.) This factor weighs in favor of the Plaintiffs, and a finding of alter ego liability.

### iii.  Operation

This factor looks to "continuity of work force"—*i.e.*, whether the new company "attracted ... employees of its own" or "employed a number of former employees of [the older company]"—and to continuity of workspace. *Dorn Sprinkler,* 669 F.3d at 795; *Bourdow,* 919 F.3d at 377. The analysis is focused on

the period when the new company began operations. *See Dorn Sprinkler*, 669 F.3d at 795. (finding "no real continuity of work force" where second company rented separate office space and only two of fourteen employees form the first company worked at the second upon opening.)

The evidence establishes that all existing Schaval Erectors employees began work under Schaar's direction at KB Erectors when it commenced operations. (Lowe Dep. 14:8-19, ECF No. 31-10.) Lowe testified that after "the union pulled his workers [from Schaval], he [Schaar] hired three others, and, yes, they did come over with me." (*Id*. at 14:9-12.) In their motion for summary judgment (ECF No. 33 PageID.483), the Defendants concede that all three Schaval employees, besides Schaar himself, began work at KB, although "two were terminated within the first few months of operation and KB hired new employees during and after this period." (ECF No. 33 PageID.483 citing Audit records ECF No. 31-7 PageID.265-67.) Critically, although KB may have hired new employees <u>after</u> commencing operations, the record shows that only the existing Schaval employees began work at KB Erectors, and were its only employees, apart from Schaar and Lowe, when it launched. Accordingly, this factor weighs in favor of the Plaintiffs, and a finding of alter-ego liability.

### iv. Equipment

This factor looks to whether the new company acquired any of the older company's equipment, and if so, whether the acquisition was an arm's-length transaction. *Dorn Sprinkler*, 669 F.3d at 795-96. In *Dorn Sprinkler*, the court focused its analysis of this factor on the equipment used at the inception of the second company. *Id*. The court found this factor weighed against finding alter-ego liability, as the second company began operations without any equipment acquired from the first company, and only subsequently acquired some of the first company's equipment later on. *Id*.

The record establishes that KB Erectors purchased a significant amount, if not all, of the equipment it needed to commence operations from Schaval Erectors and Schaar.

Concerning the equipment needed to start operating KB, Lowe testified:

> Q. As far as equipment goes, how did you purchase your equipment?
> A. Jeremy pretty much had everything.
> Q. Stop there. When you say "everything," can you give me examples?
> A. The trucks, the welders, the welding leads, the knowledge.
> …
> Q. So you relied upon Jeremy for all the equipment to run KB erectors?
> A. Yes. I bought it from him.

(Lowe Dep. 8:11-23, ECF No. 31-10)

Schaar's testimony established that KB purchased all of Schaval's equipment. (Schaar Dep. 17:25-2, ECF No. 31-4.) (Q. Now, so you sold all your equipment, including your truck, to Renee, correct? A. Yes.) While Defendants state, without support, that each of these transactions was made at arm's length (ECF No. 36 PageID.1035), no sales receipts were provided by Defendants. Thus, there is no evidence that market rate was paid for the equipment and little evidence of the transactions at all, apart from an "Expenses by Vendor Summary" containing only the amount paid for subsequent purchases made between July 3, 2018 and September 21, 2019. (ECF No. 33-11.) At her deposition, Lowe was unable to provide receipts for payments to Schaval Erectors and Schaar for the equipment that was purchased. (Lowe Dep. 19:8-22:6, ECF No. 31-10.)

Defendants also argue that the business records show that KB sourced "substantial equipment from other sources." (citing Expenses by Vendor Summary, ECF No. 33-11.) However, the Vendor Summary only shows the amount purportedly paid to each vendor, with no indication of what was purchased, or exactly when these purchases were made during the year date range encompassed by the summary.

It is undisputed that KB continues to lease vehicles from Schaar, and pays for the use of Schaar's phone number for KB's business. (Defendants' Response, ECF

No. 36 PageID.1035.) The phone number on the truck KB leases from Schaar is Schaar's number, which was used by him at Schaval. (Schaar Dep. 18:19-19:4.)

The evidence presented to this court shows that the equipment used to commence operations of KB Erectors was sourced primarily, if not entirely, from Schaval Erectors. This factor weighs in favor of Plaintiffs, and a finding of alter-ego liability.

### v. Customers

This factor looks to overlap in "customer base" and "customers." *Dorn Sprinkler*, 669 F.3d at 796; *Bourdow*, 919 F.3d at 378. Defendants do not contest that both companies primarily sourced work through Rohmann Iron. This factor weighs in favor of the Plaintiffs and a finding of alter ego liability.

### vi. Supervision

This factor looks to overlap in those who hold supervisory roles. *Allcoast Transfer*, 780 F.2d at 582. The NLRA defines "supervisor" broadly as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them ... [if] such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

Under this definition, Schaar clearly was in a supervisory role at Schaval Erectors, and is in the supervisory role at KB Erectors. Although Defendants allege that some minimal supervisory responsibility is held by Lowe, it is abundantly clear that Schaar runs the entire operation, except for signing the checks, and that Lowe totally relies on him for the operation of KB Erectors. Schaar holds complete supervisory responsibilities over fieldwork and employees, bidding on projects, and the day-to-day operation of the company. Schaar draws the largest salary; Lowe draws no salary.

This finding of supervisory authority is similar to that occurring in *Michigan BAC Health Care Fund, Trustees of v. Hartley Masonry Servs., Inc.,* No. 17-12260, 2018 WL 6527497, at *6 (E.D. Mich. 2018). In that case, the employee in question held a role similar to that of Schaar at both companies – "estimating, placing bids, hiring masons and laborers, supervision and working at job sites, etc" – and the court determined this satisfied the supervisory element. Id. at *1, 6. In the instant case, Lowe is merely the on-paper owner of KB Erectors and earns no money, while Schaar gets a significant salary. This factor weighs in favor of the Plaintiffs, and a finding of alter ego liability.

### vii.  Ownership

It is undisputed that the two companies have different owners. KB Erectors is owned, on paper, by Renee Lowe. Schaval erectors was owned by Schaar. Plaintiff concedes that this ownership factor weighs against finding alter-ego liability.  (ECF No. 31, PageID.150.) This single factor weighs in favor of Defendants, and against a finding of alter ego liability.

### viii.  Intent to Evade Labor Obligations.

This factor looks to "evidence of intent on the part of the two companies to avoid the effect of the collective bargaining agreement," or their other labor obligations. *Dorn Sprinkler*, 669 F.3d at 796; *Bourdow*, 919 F.3d at 379.

Plaintiffs point to significant evidence that KB was created with the intent to evade Schaar's obligations under Schaval's CBA. Notably, KB Erectors was created on May 10, 2018, three days after a default judgment was entered against Schaval Erectors on May 7, 2018. KB began operations shortly after.

There is also evidence of Lowe's awareness that Schaval Erectors was going out of business, and that this was related to Schaval/Schaar's issues with the Union. (Lowe Dep. 27:4-9; 28:21-23, ECF No. 31-10) Plaintiffs also identify the testimony of employee Myles Drake, who testified that Schaar "said he was in the process of becoming de-unionized, and he was trying to change his company, how things work

so he could have it the way he wanted it and stuff like that." (Drake Dep. 6:7-16, ECF No. 31-11.)

Defendants argue that the only relevant testimony on this factor is Schaar's own testimony that he did not leave Schaval to work for KB to avoid labor obligations, despite overwhelming evidence to the contrary. (Defendants' Response, ECF No. 36, PageID.1037.) Indeed, every factor in this analysis supports Plaintiffs' claim of clear intent to avoid the CBA.

The timing of the inception of KB Erectors, viewed in light of Lowe's admitted knowledge that Schaval was having issues with the union, the totality of factors supporting alter ego conversion from union to non-union, and the testimony of Schaval/KB employee Myles Drake, establish a clear intent to evade labor obligations. This factor weighs in favor of the Plaintiffs, and a finding of alter-ego liability.

### ix. Alter-Ego Conclusion

Six factors—management, business purpose, operation, equipment, customers, and supervision—weigh in favor of finding that KB Erectors is the alter ego of Schaval Erectors. There is also overwhelming evidence of an intent to evade labor obligations. The only factor that weighs in favor of the Defendants is ownership on paper, and Lowe's accounting and signing of checks. Not only does

Lowe not receive any money for her "paper" role, but evidence establishes that Schaar, her high school friend, had been paying her TV cable bill for over six years prior to the creation of KB Erectors.

Based on a balancing of the relevant factors, this Court concludes that no reasonable juror could conclude that KB Erectors is not the alter ego of Schaval Erectors. Plaintiff's Motion for Summary Judgment on alter-ego liability against Defendants is GRANTED.

### d. Defendant Jerome Schaar's Personal Liability

Plaintiffs argue that Schaar, as a signatory to the CBA, is a fiduciary regarding KB's alleged Plan assets and is therefore personally liable for unpaid benefit contributions for the period of the CBA. Both parties move for summary judgment on this claim.

Defendants' sole argument in their Motion for Summary Judgment (ECF No. 33) is that Schaar is not personally liable because KB Erectors is not the alter-ego of Schaval Erectors. Because this Court has found that KB is the alter-ego of Schaval, Defendants' Motion for Summary Judgment on this claim is DENIED.

Under ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). ERISA defines a fiduciary, in relevant

part, as any person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... [or] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

The Sixth Circuit "employs a functional test to determine fiduciary status." *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006) (citing *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001)) (observing that "[t]he Supreme Court has recognized that ERISA 'defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan ...' "). A party's status as a fiduciary " 'is not an all or nothing concept' "; a court must ask whether the person is a fiduciary " 'with respect to the particular activity in question.' " *Id.* (quoting *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995)). "Congress intended ERISA's definition of fiduciary 'to be broadly construed.' " *Roofers Loc. 149 Sec. Ben. Tr. Fund v. Milbrand Roofing Grp., Inc*., No. 05-60218, 2007 WL 835802, at *1 (E.D. Mich. Mar. 14, 2007) quoting *LoPresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir.1997)

To decide whether Schaar was acting as an ERISA fiduciary, the Court must determine whether (1) unpaid benefits are Plan assets; and (2) he exercised discretionary control or authority over such assets. *Trustees of Iron Workers' Local*

*No. 25 Pension Fund v. Mun. & Indus. Storage, Inc.,* No. 2:10-CV-12502-PDB, 2011 WL 1515047, at *3 (E.D. Mich. Mar. 24, 2011) (Borman, J.) (citations omitted).

### i. Plan Assets

Plaintiffs argue that amounts withheld from a participant's wages for deposit into an employee welfare fun are "plan assets," citing 29 C.F.R. § 2510.3-102(a). Defendants do not challenge this issue. Plaintiffs also point to the relevant CBA and trust documents, which explicitly state that "[c]ontributions become vested plan assets at the time they become due and owing to the Fund." (CBA, ECF No. 31-2, PageID.188.) Caselaw supports Plaintiffs' argument, and as the court in *Plumbers Local 98 Defined Ben. Pension Fund v. M & P Master Plumbers of Michigan, Inc* noted, "Judges in this district have repeatedly held that contributions are plan assets as soon as they are *due and owing."* 608 F. Supp. 2d 873, 877 (E.D. Mich. 2009) (collecting cases) (emphasis in original). Accordingly, this Court finds that benefits that went unpaid by KB erectors are "plan assets."

### ii. Defendant Jerome Schaar's Status As A Fiduciary

To determine whether Schaar was a fiduciary regarding KB's Plan assets, the conduct at issue must be examined "to determine whether it constitutes

'management' or 'administration' of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect of an ERISA plan not subject to fiduciary standards." *Operating Engineers' Local 324 Pension Fund v. Midstates Contractors, L.L.C.,* No. 04-73052, 2007 WL 496706, at *5 (E.D. Mich. Feb. 13, 2007) quoting *Seaway Food Town, Inc. v. Medical Mutual of Ohio,* 347 F.3d 610, 617 (6th Cir. 2003).

Courts generally look to whether the individual had some authority over payments from the company. *See Trustees of Iron Workers' Local No. 25 Pension Fund v. Mun. & Indus. Storage, Inc.,* No. 2:10-CV-12502-PDB, 2011 WL 1515047, at *3-4 (E.D. Mich. Mar. 24, 2011) (Borman, J.), In *Trustees v. Mun. & Indus. Storage*, this Court found that an individual was an ERISA fiduciary where that individual was the primary shareholder of the company, admitted that he ran the day-to-day operations, and decided what bills to pay, "including whether or not to make the fringe benefit contributions … ." *Id*. Courts in the Eastern District of Michigan have held that this type of control demonstrates that the defendant is an ERISA fiduciary and can be held personally liable for breaches of that duty. *See Plumbers Loc. 98 Defined Ben. Pension Fund v. M & P Master Plumbers of Michigan, Inc*., 608 F. Supp. 2d 873, 879 (E.D. Mich. 2009) ("[Defendant] also admitted that he had the final say in all decisions regarding M & P, including whether fringe benefit contributions were to be paid."); *Iron Workers' Loc. No. 25 Pension Fund v.*

*McGuire Steel Erection, Inc.*, 352 F. Supp. 2d 794, 806 (E.D. Mich. 2004) ("[G]iven Defendant McGuire's admission that he was responsible for the day-to-day operation of Defendant McGuire Steel, including the decision of whether or not to pay ERISA benefit contributions, no reasonable jury could find that he did not act in a fiduciary capacity.").

Defendants cite to *Iuoe Local 324 Ret. Tr. Fund v. LGC Glob. FM, LLC*, No. CV 17-13921, 2019 WL 4741838, at *9 (E.D. Mich. Sept. 27, 2019) (Parker, J). In that case, the court found insufficient the evidence that a non-owner of a company was a fiduciary and denied summary judgment to the plaintiffs. The plaintiffs in *Iuoe* argued that the individual defendant was a fiduciary because he signed checks on behalf of the company and borrowed assets from the company for personal use. *Id*. After a review of precedent from several Circuits, the court in *Iuoe* found that the defendant was not a fiduciary because the plaintiffs failed to produce any evidence that the defendant "had any role in deciding or directing who to pay from [defendant company's] business account or when to make payments from that account." *Id*. at 11. That is not the case here, where Schaar hired his Schaval Erectors employees to work at KB Erectors, decides the number of employees required, their hours/pay, and receives a substantial salary, while Lowe receives no money.

When the assets of KB Erectors, and thus the Plan, were used to operate KB through May 2019, it is undisputed that they were used for purposes other than

payment of benefits. Plaintiffs received no money. The question then becomes whether Schaar had any discretionary control or authority over payments made by KB, or as the court in *Iuoe* phrased it, "any role in deciding or directing who to pay" from KB's account. *Id*. at 11.

KB Erectors is the alter ego of Schaval Erectors, and Schaar was instrumental in creating and operating KB Erectors. Schaar is the field supervisor at KB Erectors, sets employee pay rates, and does all of the bidding on jobs. Schaar has input into who is hired and laid off at KB, and while the Lowe alleges that she was consulted and retained ultimate authority for these decisions (Lowe Dep. 16:1-14), it is clear that Lowe deferred to Schaar's judgment/direction at KB. (Schaar Dep. 14:10-17:22; 29:16-20.)

Lowe admitted to having no experience in the steel erection industry or any similar business before starting KB Erectors. As of the time of her deposition in March 2020, nearly two years after KB commenced operation, she did not draw a salary from KB, nor did she ever. (Lowe Dep. 17:25-18:5.) Lowe admitted that she would have been unable to run the business without Schaar. (Lowe Dep. 32:6-9.) While Lowe testified that she makes some "final decisions on a lot of the jobs," she admits that Schaar is making all of the operational decisions. (Lowe Dep. 22:11-23:11.) Although there is no evidence that Schaar has authority to sign tax or corporate papers for anything related to KB Erectors, the Court finds that

overwhelming evidence establishes that this Lowe "paper trail" is part of the subterfuge concocted by Schaar and Renee Lowe. Schaar was controlling KB Erectors, just has he had controlled Schaval Erectors.

Given the facts of this case, and taking the facts in the light most favorable to the non-moving party, the Defendants, the Court concludes that Schaar, who created the KB subterfuge, brought over to KB Erectors his employees, equipment, phone number, customer contacts (Rohmann Iron), and then held actual control over KB Erectors' business, had control/authority over KB's assets and therefore over Plan assets. Schaar's essential role in the creation, existence, and operation of KB Erectors supports this Court's conclusion to deem him a fiduciary. Accordingly, Plaintiffs' Motion for Summary Judgment on Schaar's personal liability as a fiduciary is GRANTED.

Finally, insofar as KB Erectors was a partner in this alter ego scheme, the Court GRANTS Plaintiffs' motion for alter ego successor liability against KB Erectors.

## IV. Conclusion

In conclusion, Defendants' Motion for Partial Summary Judgment (ECF No. 33) is DENIED.

As to Count I against Schaval Erectors, Plaintiffs' Motion for Summary Judgment (ECF No. 31) is GRANTED, and Schaval Erectors and Jerome Schaar are liable to Plaintiffs in the amount of $2.623.90 for additional unpaid benefit contributions.

As to Counts II and III, Plaintiffs' Motion for Summary Judgment is GRANTED. Jerome Schaar and KB Erectors, LLC are liable for the unpaid contributions to the Plaintiffs in the amount of $282,559.79 for work performed by KB Erectors through May 31, 2019, the expiration date of the CBA.

SO ORDERED.

Dated: June 21, 2021                          s/Paul D. Borman

                                              Paul D. Borman
                                              United States District Judge